1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

9

10

11

12

LESLIE ELISA SMITH,

              Plaintiff,

    v.

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

            Defendant.

C14-1530 TSZ

ORDER

13

14

15

16

17

18

      THIS MATTER comes before the Court on appeal from a final decision of the Acting Commissioner of the Social Security Administration ("Commissioner") denying plaintiff Leslie Elisa Smith's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401-434 and 1381-1383f.  Having reviewed all papers filed in connection with the appeal, the Court enters this order.

19

**Background**

20

21

22

      Plaintiff was born in 1976.  AR 24.  She did not complete high school or obtain a general educational development ("GED") certificate, but she attended community

23

ORDER - 1

college for a few quarters and received a certificate in private investigation from the University of Washington.  AR 39-40.  Plaintiff was previously employed as a legal secretary, a paralegal, a file clerk, a research assistant, an administrative assistant, and a stenographer.  AR 24 & 62.  In her DIB and SSI applications, plaintiff alleged that the onset date of her disability was January 1, 2006, AR 188 & 190, which was around the time she was involved in a motor vehicle accident, AR 76.  In a Disability Report prepared at the Field Office in February 2012, plaintiff's potential disability onset date was instead estimated to be December 31, 2008, in light of her work and substantial gainful activity after January 1, 2006.  AR 214.  On December 14, 2012, the day after the hearing in this matter was held before Administrative Law Judge ("ALJ") Larry Kennedy, plaintiff amended her alleged disability onset date to September 15, 2011. AR 186.

In denying plaintiff's DIB and SSI applications, ALJ Kennedy found that plaintiff has the following severe impairments:  fibromyalgia, major depression, and generalized anxiety disorder.  AR 15.  ALJ Kennedy further concluded that plaintiff has the residual functional capacity to perform past relevant work as a file clerk and also to make an adjustment to other occupations (for example, a mail clerk and a photocopy machine operator) as to which a significant number of jobs exist in the national and regional economy.  AR 24-25; _see also_ AR 65 (the vocational expert estimated 69,000 U.S. and 1,200 Washington positions for mail clerk, and 26,000 U.S. and 600 Washington positions for photocopy machine operator).  As a result, ALJ Kennedy ruled that plaintiff "has not been under a disability . . . from September 15, 2011, through the date of this

1  decision," which was issued on March 20, 2013.  AR 25.  The Appeals Council denied

2  plaintiff's request for review.  AR 1-4.  Plaintiff now seeks judicial review pursuant to

3  42 U.S.C. §§ 405(g) and 1383(c)(3).

4  **Discussion**

5        This Court's review is limited to assessing whether the ultimate denial of benefits

6  is free of legal error and based on factual findings that are supported by substantial

7  evidence.  _See Tidwell v. Apfel_, 161 F.3d 599, 601 (9th Cir. 1998); _see also_ 42 U.S.C.

8  § 405(g).  Substantial evidence means "more than a mere scintilla, but less than a

9  preponderance" of evidence; it is "such relevant evidence as a reasonable person might

10  accept as adequate to support a conclusion."  _Lingenfelter v. Astrue_, 504 F.3d 1028, 1035

11  (9th Cir. 2007).  In determining whether the factual findings are supported by substantial

12  evidence, the Court must "review the administrative record as a whole, weighing both

13  the evidence that supports and the evidence that detracts from the Commissioner's

14  conclusion."  _Reddick v. Chater_, 157 F.3d 715, 720 (9th Cir. 1998).  The Court "may not

15  affirm simply by isolating a specific quantum of supporting evidence."  _Jones v. Heckler_,

16  760 F.2d 993, 995 (9th Cir. 1985).  If, however, the evidence reasonably supports both

17  affirming and reversing the denial of benefits, the Court may not substitute its judgment

18  for that of the ALJ.  _See Reddick_, 157 F.3d at 720-21; _see also Thomas v. Barnhart_, 278

19  F.3d 947, 954 (9th Cir. 2002) (if "the evidence is susceptible to more than one rational

20  interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be

21  upheld").

22

23

Plaintiff presents six issues for the Court's consideration: (i) whether the administrative record is complete; (ii) whether the opinions of certain practitioners were properly discounted; (iii) whether plaintiff's condition was appropriately considered to be stable; (iv) whether ALJ Kennedy adequately explained his evaluation of plaintiff's credibility; (v) whether due weight was given to plaintiff's parents' written statements; and (vi) whether plaintiff's receipt of benefits from Washington's Department of Social and Health Services ("DSHS") should have been considered. In framing these issues, plaintiff has departed from the traditional manner of challenging a denial of social security benefits, which usually targets the conclusions reached at one or more of the five steps in the sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act.[1]

---

[1] Step one of the sequential evaluation process inquires whether the claimant is presently engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i) & 416.920(a)(4)(i); *see also id.* at § 404.1572 (defining "substantial gainful activity"). If so, the claimant is not entitled to disability benefits, and no further evaluative steps are required. *Id.* at §§ 404.1520(b) & 416.920(b). Step two asks whether the claimant has a severe impairment, or a combination of impairments, that significantly limits the claimant's physical or mental ability to do basic work activities. *See id.* at §§ 404.1520(a)(4)(ii)&(c) and 416.920(a)(4)(ii)&(c). If not, the claimant is not entitled to disability benefits, and again, additional analysis is not required. *Id.* Step three involves a determination of whether any of the claimant's severe impairments is equivalent to one that is listed in the regulations. *Id.* at §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii). A claimant with an impairment that "meets or equals" a listed impairment for the requisite twelve-month duration is "per se" disabled and qualifies for benefits. *See id.* at §§ 404.1520(d) & 416.920(d). If the claimant is not "per se" disabled, then the question under step four is whether the claimant's "residual functional capacity" enables the claimant to perform past relevant work. *Id.* at §§ 404.1520(a)(4)(iv) & 416.920(a)(4)(iv). If the claimant can still perform past relevant work, then the claimant is not entitled to disability benefits and the inquiry ends there. *Id.* at §§ 404.1520(e)-(f) & 416.920(e)-(f). On the other hand, if the opposite conclusion is reached, the burden shifts to the Commissioner at step five to prove that the claimant can make an adjustment to other work, taking into account the claimant's age, education, and work experience. *Id.* at §§ 404.1520(a)(4)(v) & 416.920(a)(4)(v); *see id.* at §§ 404.1560(c)(2) & 416.960(c)(2). If the claimant cannot make such adjustment to other work, disability benefits may be awarded. *Id.* at §§ 404.1520(g) & 416.920(g).

Plaintiff does not appear to separately attack ALJ Kennedy's determination, at step two, that her thyroid disease, calcium and Vitamin D deficiencies, scoliosis, joint hypermobility, thoracic and shoulder strain, and left-sided rhomboid myofacial pain syndrome are not severe impairments, _see_ AR 16, or ALJ Kennedy's conclusion, at step three, that plaintiff is not "per se" disabled, AR 16-18.  Moreover, plaintiff does not challenge the vocational expert's testimony, for purposes of step four, that a person with the residual functional capacity described in the hypothetical posed by ALJ Kennedy could perform plaintiff's past work as a file clerk, or the vocational expert's estimates, for purposes of step five, about the number of other jobs available for such hypothetical person.  Rather, plaintiff's arguments seem to focus exclusively on the assessment of her residual functional capacity.[2]  Plaintiff's contentions lack merit.

## A.    Administrative Record

Plaintiff asserts that certain materials are missing from the administrative record.  The Court has rejected similar arguments made by plaintiff's attorney in another case.  _See_ _Yost v. Colvin_, 2016 WL 2989957 (W.D. Wash. May 24, 2016).  Although _Yost_

---

[2] ALJ Kennedy concluded that plaintiff has the residual functional capacity to perform "light work," meaning that she can lift up to 20 pounds occasionally and 10 pounds frequently, can sit, stand, and walk for six of eight hours in a workday, with normal breaks, but should not be required to sit for more than one hour at a time, can frequently balance and occasionally climb ramps or stairs, stoop, kneel, or crouch, but cannot climb ladders, ropes, or scaffolds, cannot crawl, and cannot tolerate concentrated exposure to extreme cold, vibration, or hazards.  AR 18.  According to ALJ Kennedy, plaintiff is also capable of frequent bilateral reaching, handling, and fingering, of understanding, remembering, and carrying out simple and some detailed instructions, and of making judgments on simple and some detailed work-related decisions.  _Id._  ALJ Kennedy viewed plaintiff as having an average ability to perform sustained work activities within customary tolerances of employers' rules regarding sick leave and absences, and concluded that she would work best in an environment that is predictable and had few work setting changes and in which she was not required to have more than superficial contact with co-workers and supervisors and did not deal with or frequently encounter the general public as an essential element of the work process.  _Id._

ORDER - 5

1   involved a different ALJ, and a different procedural posture,[3] the reasoning in _Yost_

2   applies equally to this matter -- a non-random[4] assortment of an ALJ's prior decisions

3   does not establish bias on the part of the ALJ.  _Id._ at *2-*4.  As in _Yost_, in this matter,

4   plaintiff's attempts to infer prejudice from statistical comparisons fail.[5]  _See id._ at *3-*5.

5

---

6   [3] In _Yost_, the materials alleged to be missing from the administrative record had been submitted to

7   the ALJ, in advance of the hearing.  In contrast, in this case, the documents at issue were on a compact disc enclosed with counsel's 53-page letter to the Appeals Council, dated November 22, 2013, concerning a different claimant.  Ex. 19E/4-56 (AR 325-77).  The November 2013 letter to the Appeals Council was

8   transmitted under cover of a two-page letter dated December 5, 2013, regarding this case.  AR 323-34. According to the declaration of plaintiff's attorney that accompanied the letters to the Appeals Council,

9   the following items were on the compact disc:  (i) 54 decisions issued by ALJ Kennedy between September 26, 2012, and August 5, 2013, involving other claimants; (ii) psychological or psychiatric evaluations associated with 12 of those 54 cases; (iii) briefs and records submitted to the Appeals Council

10   in connection with some of those 54 decisions; (iv) declarations from five attorneys who practice before the Social Security Administration; (v) declarations from other claimants whose matters were decided by

11   ALJ Kennedy; (vi) a letter from ALJ Kennedy to Chief ALJ David Delaittre requesting that attorney Anne Kysar's fee be reduced in connection with an unrelated proceeding; (vii) an order of the Appeals Council reversing a decision of ALJ Kennedy in a different case; (viii) letters from James Czysz, Ph.D.

12   and Keith Sonnanburg, Ph.D.; and (ix) various published articles and practice guides, a mental residual functional capacity assessment form, and Administrative Message 13066.  _See_ AR 378-79.

13   [4] The 54 decisions that plaintiff's lawyer proffered to the Appeals Council involve claimants represented

14   by a small number of law firms, including Schroeter, Goldmark & Bender.  None of the decisions involve claimants who appeared pro se.  Plaintiff has not described how the demographics of claimants

15   represented by the law firms in question compare with the demographics of claimants concerning whom ALJ Kennedy issued decisions during the time period at issue, has not identified the other nine law firms involved, and has not indicated what portion of the 54 decisions concern clients of Schroeter, Goldmark

16   & Bender; plaintiff's attorney has merely stated that, to the best of his knowledge, the 54 decisions at issue represent all rulings by ALJ Kennedy received by the law firms in question during the time period described.  AR 365-66.

17

18   [5] In his November 2013 letter to the Appeals Council, plaintiff's attorney indicated that, during the period from September 29, 2012, to June 28, 2013, ALJ Kennedy issued 289 decisions, 94 of which (or 32.5%)

19   were favorable.  AR 364.  During the same timeframe, the median rate of favorable decisions (reversals) among the 1,336 ALJs nationwide, who each issued more than 200 rulings in such period, was 54.95%.

20   AR 365.  As indicated in _Yost_, this comparison does not establish bias, but rather might simply reflect that determinations made initially and/or on reconsideration in this region are of higher quality than elsewhere in the nation, leading to a lower reversal rate on the part of ALJ Kennedy and his peers in Seattle.  _See Yost_, 2016 WL 2989957 at *3.  Of the 54 decisions by ALJ Kennedy that were proffered to the Appeals

21   Council, which are from a slightly broader range of dates (September 26, 2012, to August 5, 2013), apparently 16 (or 29.6%) were favorable.  _See_ AR 366.  According to plaintiff's counsel, 26 of the 54

22   decisions explicitly referred to DSHS, and 33 of the 54 decisions mentioned Global Assessment of Functioning ("GAF").  AR 366-67.  Plaintiff's lawyer argues that the lower rates of reversal among the

23

ORDER - 6

To the extent that the items plaintiff contends should be included in the administrative

record concern claimants other than plaintiff,[6] such documents are not "evidence," and

plaintiff's request to add such materials to the administrative record is DENIED.[7]  _See_ _id._

at *2; _see also_ _Mostafavinassab v. Colvin_, 2016 WL 4547129 at *1 n.1 (W.D. Wash.

Sep. 1, 2016).

**B.   Practitioners' Opinions**

Plaintiff asserts that ALJ Kennedy improperly discounted the opinions of

(i) Rachel Berger, a social worker at Sound Mental Health; (ii) Crystal DeLoach, Ph.D.,

a treating psychologist; (iii) Dana Harmon, Ph.D., a non-examining psychologist; and

(iv) Raymond West, M.D., an examining physician, and that ALJ Kennedy erred in

---

decisions containing the acronyms DSHS (5 of 26, or 19%) and GAF (6 of 33, or 18%) reflect a prejudice on the part of ALJ Kennedy against the poor and the mentally ill.  _See_ _id._  As in _Yost_, in this case, plaintiff's counsel has not provided enough information about the comparator decisions (in which the acronyms DSHS and GAF do not appear) and has not offered statistically significant sample sizes and variations to support his accusation of bias.  _See_ _Yost_, 2016 WL 2989957 at *3-*4.

[6] Plaintiff's attorney's December 2013 cover letter to the Appeals Council indicated that the enclosed compact disc also contained a declaration from plaintiff describing "her hearing experience with ALJ Kennedy and his treatment of her."  AR 323.  Plaintiff's declaration is not in the administrative record, and it has not been attached to either her opening or reply brief in this matter.  The administrative record, however, includes the entire transcript of the proceeding before ALJ Kennedy, which the Court has thoroughly reviewed.  The transcript reveals no basis to question ALJ Kennedy's ability "to render fair judgment."  _See_ _Liteky v. United States_, 510 U.S. 540, 556 (1994).

[7] The Court previously denied plaintiff's separate motion to remand for purposes of supplementing the administrative record.  _See_ Minute Order at ¶ 2 (docket no. 35).  The Court, however, made no ruling concerning whether the 1,862 pages of materials that plaintiff wished to add to the administrative record could be considered in reviewing the denial of her DIB and SSI applications.  _Id._ at ¶ 3.  For the sake of clarity, the Court observes that the omission from the administrative record of published articles, practice guides, administrative messages, and the like does not prevent the parties or the Court from citing to or relying on such authorities.  Moreover, although the declarations of attorneys and other claimants who have appeared before ALJ Kennedy were not included in the administrative record, plaintiff's counsel's November 2013 letter, which is in the administrative record, quoted extensively from such declarations, _see_ AR 357-64, and the substance of those declarations is therefore before the Court.  Finally, lengthy passages from the letters of Drs. Czysz and Sonnanburg were reproduced by counsel in the letter provided to the ALJ in _Yost_, _see_ 2016 WL 2989957 at *2 n.4, which the Court has already reviewed.

1   ignoring the opinion of (v) June Tanner, a clinician formerly at Sound Mental Health.

2   Plaintiff's arguments lack merit.  In the social security context, the opinion of a treating

3   practitioner is generally entitled to more weight than the opinions of examining or non-

4   examining (consulting) practitioners.  _Lester v. Chater_, 81 F.3d 821, 830 (9th Cir. 1995).

5   When a practitioner's opinion is not contradicted by another practitioner, it may be

6   rejected only for "clear and convincing" reasons.  _Id._  On the other hand, in the event of

7   disagreement among practitioners, a treating or examining practitioner's opinion can be

8   disregarded only for "specific and legitimate" reasons supported by "substantial

9   evidence" in the record.  _Id._  ALJ Kennedy articulated the requisite "clear and

10  convincing" or "specific and legitimate" grounds for attributing less than full weight to

11  the opinions at issue.

12      1.   **Rachel Berger**

13      In a letter dated October 17, 2012, to plaintiff's attorney at the agency level,

14  Rachel Berger indicated that she had been providing mental health counseling and case

15  management to plaintiff since June 2012.  AR 284.  Berger stated that she had been

16  meeting with plaintiff for one hour every other week, and that during the roughly four

17  months she had worked with plaintiff, she had observed plaintiff's "functioning wax and

18  wane."  _Id._  Berger wrote that she could "absolutely imagine [plaintiff] missing work if

19  she were forced to work a regular 40 hour/week schedule," but that "it would be

20  beneficial for her to work at least part time because not being engaged in meaningful

21  activity can exacerbate depressive symptoms."  _Id._  Berger further informed plaintiff's

22  lawyer that plaintiff had "never neglected to care for her own hygiene" and had "always

23

been on time" for appointments, although she had missed some appointments and was hard to reach by phone during the previous month in connection with losing her apartment. _Id._ Berger also expressed a belief that plaintiff does not struggle with social interaction or with supervision in employment situations. _Id._

ALJ Kennedy gave "little weight" to Berger's opinion for four reasons: (i) she had treated plaintiff for only four months and did not appear to have considered the longitudinal record; (ii) she offered only a vague suspicion that plaintiff would miss work, and did not quantify the frequency of expected absenteeism; (iii) her opinion about plaintiff being unable to maintain a regular full-time work schedule conflicted with the other evidence in the record and with her own observations that plaintiff was able to care for herself and arrive on time for appointments; and (iv) her letter was merely responsive to plaintiff's counsel's inquiries, which asked about the least plaintiff can do rather than the most she can do, as required by the applicable regulations. AR 21; _see also_ Ex. 17E (AR 317-18). Plaintiff criticizes the first three grounds,[8] but does not address the last

---

[8] Plaintiff argues that the brevity of her relationship with Berger should not have been a factor because ALJ Kennedy did not explicitly discuss the longevity of her relationships with other treatment providers. ALJ Kennedy, however, had no reason to comment on the length of plaintiff's treatment history with other practitioners; his point with respect to Berger was that she did not have a sufficient perspective to evaluate plaintiff's ability to sustain full-time employment. Plaintiff also contends that Berger's opinion was neither vague nor inconsistent with her observations about plaintiff's timeliness for counseling sessions; plaintiff asserts that, because the vocational expert testified employers generally tolerate one absence every two months, AR 66, and because she missed more than one session with Berger in a two-month period, Berger's suspicion that she would miss work was entitled to more weight than ALJ Kennedy gave it. Plaintiff's analysis is flawed. The vocational expert quantified the level of absenteeism that would be acceptable, but Berger's opinion does not indicate whether plaintiff might be expected to miss work in excess of such limit. Similarly, Berger's letter does not state the exact number of appointments plaintiff missed, _but see_ Ex. 17F; AR 573 (documenting only one missed session during the period from July to September 2012), and plaintiff's attempt to correlate anticipated absences from work with therapy "no shows" fails.

basis for discounting Berger's opinion, which alone constitutes a sufficient reason for

assigning it "little weight."  _See_ 20 C.F.R. §§ 404.1545(a) & 416.945(a) ("Your residual

functional capacity is _the most you can still do_ despite your limitations." (emphasis

added)).  ALJ Kennedy gave appropriate consideration to Berger's opinion.

### 2.  Crystal DeLoach, Ph.D.

Dr. DeLoach has provided psychotherapy to plaintiff since late October 2005.

AR 500.  The administrative record contains treatment notes dating back to January 2008,

which is over three-and-a-half years before plaintiff's alleged disability onset date of

September 15, 2011.  _See_ Ex. 10F.  Dr. DeLoach's clinical records closer to the onset

date indicate that, in early July 2011, plaintiff reported her new job was "going well," she

was "excited and settling in," her mood had improved, and she had increased energy.

AR 508.  Plaintiff failed to show up for her next two sessions, and on August 1, 2011,

Dr. DeLoach left plaintiff a voicemail indicating that she would need to call if she wished

to schedule further appointments.  _Id._  In early September 2011, plaintiff phoned and told

Dr. DeLoach that she was "overwhelmed with life issues," but was "coping okay and able

to maintain work and self care."  _Id._  Plaintiff also informed Dr. DeLoach that she was

"officially tak[ing] a break from treatment."  _Id._  In late November 2011, plaintiff called

"in crisis," and then, two days later, failed to show up for an appointment.  _Id._

On December 13, 2011, plaintiff was seen by Dr. DeLoach and indicated that she

was going through a divorce.  AR 507.  During the next appointment, on January 3, 2012,

plaintiff stated that she was "hopeful" about monetary assistance to pay rent and was

considering both applying for social security benefits and declaring bankruptcy after her

1   divorce was final in five weeks.  *Id.*  At the following two sessions, plaintiff further

2   discussed applying for social security benefits, and during the latter appointment, on

3   January 18, 2012, Dr. DeLoach agreed to provide a treatment summary to assist in that

4   process.  *Id.*  Plaintiff thereafter had no face-to-face interactions with Dr. DeLoach, but

5   spoke with Dr. DeLoach on the phone on January 22, 2012, and made an appointment for

6   two days later at 1:30 p.m., which she did not keep, explaining by phone the following

7   day, January 25, 2012, that she had overslept.  AR 506-07.  Plaintiff again called

8   Dr. DeLoach on February 21, 2012, and was informed that Dr. DeLoach had completed a

9   letter in support of her DIB and SSI applications.  AR 506.  On March 18, 2012, plaintiff

10  telephonically requested an appointment for March 21, 2012, but she did not show up for

11  that session, and she did not respond to two attempts by Dr. DeLoach to contact her.  *Id.*

12        Meanwhile, Dr. DeLoach authored two letters, one dated February 7, 2012, and

13  the other dated March 3, 2012.  In the February 2012 letter, Dr. DeLoach wrote:

14        During the past year, Ms. Smith has been severely depressed, anxious and
        withdrawn.  Despite careful medication management and her consistent
15        adherence to psychiatric medication recommendations, Ms. Smith has
        frequently been so depressed and anxious that she has been unable to
16        function.  Ms. Smith has frequently missed therapy sessions due to her low
        mood, sleeping through the day and losing track of what day it is, being so
17        preoccupied by anxieties that she is unable to get ready to leave the house
        and get to the bus in time to make an appointment, and/or because of being
18        overwhelmed by the idea of walking the couple of miles to my office.  She
        is also likely physically unable to walk several miles due to fibromyalgia
19        and chronic pain. . . .

20        Ms. Smith is currently in the process of a divorce from her husband of
        nearly three years.  The strained and difficult relationship situation has
21        increased her anxious and depressive symptoms and likely exacerbated her
        physical symptoms. . . .

22

23

ORDER - 11

> Ms. Smith is trained as a paralegal and as a legal investigator.  Ms. Smith has worked extensively as a paralegal.  However, in the last 4 years she has not been able to maintain a job in the legal profession due to the significant time demands and intensity of the work.  Ms. Smith has accepted less demanding jobs in the last two years, but has not been able to fulfill the work schedule and other demands due to her anxiety, chronic exhaustion, depression and frequent illnesses which require hospitalization and/or emergency room visits followed by extended bed rest on doctor's orders.

AR 500-01.  Dr. DeLoach also indicated in her February 2012 letter that she had assigned plaintiff a Global Assessment of Functioning score of 21.  AR 502.  In her March 2012 letter, Dr. DeLoach offered the following opinion:

> Ms. Smith presents a complicated case of physical ailments and psychological disorder.  I do not believe that Ms. Smith will be able to return to full-time professional employment in the foreseeable future.  Ms. Smith is motivated and has tried hard to work, but has been unable to sustain any, even part-time, employment in the last 5 years due to her psychological and physical problems.  In a year or so, Ms. Smith would likely be able to sustain a part-time job with very flexible hours in which she can utilize her intellect without increased physical or psychological distress.

AR 503.

ALJ Kennedy gave "little to no weight" to Dr. DeLoach's letters for the following reasons:  (i) Dr. DeLoach's assessment of plaintiff's mental status, particularly the low GAF score she had ascribed to plaintiff, contradicted her own, repeated observations that plaintiff was "oriented x3," had clear speech and thought, and was not experiencing hallucinations, delusions, or suicidal ideation, AR 507-08, and also conflicted with plaintiff's statement in September 2011 that she was "coping okay and able to maintain work and self care," AR 508; (ii) Dr. DeLoach's opinion concerning plaintiff's physical limitations was not consistent with the objective findings in the record and was outside

1    the scope of her professional training and expertise; and (iii) Dr. DeLoach's statement

2    that plaintiff experienced frequent illnesses requiring hospitalization, emergency room

3    visits, and/or extended bed rest was unsupported by the record and appeared to be based

4    entirely on plaintiff's subjective reports.  AR 21-22.

5         Plaintiff does not dispute the latter two grounds for discounting Dr. DeLoach's

6    opinion, namely that Dr. DeLoach was unqualified to evaluate plaintiff's physical

7    limitations and that Dr. DeLoach's reliance on plaintiff's reports of hospitalizations,

8    emergency room visits, and/or extended bed rest was misplaced.  With respect to the first

9    basis for assigning "little to no weight" to Dr. DeLoach's assessment, plaintiff asserts that

10   ALJ Kennedy improperly questioned the GAF score of 21.  The Court disagrees.  Global

11   Assessment of Functioning, which had been Axis V in a multi-axial system for assessing

12   mental disorders, is no longer in widespread use.  Am. Psychiatric Ass'n, DIAGNOSTIC &

13   STATISTICAL MANUAL OF MENTAL DISORDERS 16 (5th ed. 2013) ["DSM-5"].  The GAF

14   scale had ranged from 0 to 100, with each 10-point increment having both a symptom

15   severity and a functioning component; a GAF rating would fall within particular decile

16   (_e.g._, 1-10, 11-20, etc.) if either the symptom severity or the level of functioning met the

17   critieria.  Am. Psychiatric Ass'n, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL

18   DISORDERS 32 (4th ed. (Text Revision) 2000) ["DSM-IV-TR"]; _see id._ at 33 (indicating

19   that, when an "individual's symptom severity and level of functioning [were] discordant,

20   the final GAF rating always reflect[ed] the worse of the two").  A GAF score between 21

21   and 30 was intended to reflect behavior "considerably influenced by delusions or

22   hallucinations," a "serious impairment in communication or judgment," or an "inability

23

ORDER - 13

1   to function in almost all areas," for example, staying in bed all day, with no job, no home,

2   and no friends.  *Id.* at 34.  The record reflects that plaintiff did not meet any of these

3   criteria, and ALJ Kennedy appropriately concluded that Dr. DeLoach had rated plaintiff

4   unjustifiably low on the GAF scale.[9]

5          Plaintiff further contends that Dr. DeLoach's opinion regarding her inability to

6   return to full-time employment in the foreseeable future was not contrary to plaintiff's

7   statement in September 2011 (about coping and maintaining work and self care) because,

8   after making such statement and before Dr. DeLoach authored the letter at issue, plaintiff

9   was attacked by an ex-boyfriend.  Plaintiff's argument is unpersuasive.  According to the

10  declaration she submitted after the hearing before ALJ Kennedy, plaintiff's ex-boyfriend

11  attempted to strangle her on October 3, 2011.  AR 186.  Plaintiff, however, had no

12  contact with Dr. DeLoach between September 7, 2011, when she reported by phone that

13  she was "coping okay," and November 22, 2011, when she called "in crisis."  AR 508.

14

---

15  [9] The GAF methodology was considered "useful in tracking the clinical progress of individuals in global
16  terms, using a single measure" with respect to "psychological, social, and occupational functioning," but
    not as to physical impairments or environmental limitations.  DSM-IV-TR at 32.  The DSM-5 has moved
    away from the axial diagnosis method and discarded the GAF scale because of "its conceptual lack of
17  clarity" and "questionable psychometrics in routine practice."  DSM-5 at 16.  In the wake of the DSM-5's
    publication, Administrative Message 13066 was issued, indicating that GAF scores should continue to be
18  treated as opinion evidence, but also advising that the weight to be given to a GAF score depends on the
    rater's expertise and familiarity with the claimant, the clarity of the rater's explanation for the GAF score,
    the time period during which the GAF score applies, and whether the GAF score is consistent with other
19  evidence.  AM 13066 (effective July 22, 2013); *see* *Wynn v. Colvin*, 2015 WL 5569000 at *11 n.10
    (W.D. Wash. Sep. 22, 2015) (observing that AM 13066 is "an agency interpretation that does not impose
20  judicially enforceable duties on either the ALJ or this Court").  ALJ Kennedy's basis for discounting
    Dr. DeLoach's GAF score was consonant with Administrative Message 13066.  ALJ Kennedy's disregard
21  of GAF scores articulated by Fairfax Hospital was also consistent with Administrative Message 13066,
    which recognizes that, for a GAF rating to have any weight, it must relate to the relevant timeframe.  The
    GAF scores articulated at Fairfax Hospital in October 2008 (30 upon admission, and 50 upon discharge),
22  AR 380, related to a period almost three years before plaintiff's alleged disability onset date.

23

1    Neither the chart notes relating to the November 2011 phone conversation nor the letters

2    issued by Dr. DeLoach in early 2012 make any reference to the ex-boyfriend or the

3    alleged strangulation, and plaintiff's theory that Dr. DeLoach's opinion was influenced

4    by or premised on increased symptoms relating to such incident is not supported by the

5    record.

6         Instead, the record reflects that, in mid-summer 2011, plaintiff was doing well,

7    and that she took a break from psychotherapy until the winter of 2011/2012, when she

8    requested Dr. DeLoach's assistance in applying for social security benefits.  She

9    thereafter had no in-person contact with Dr. DeLoach, and the Court is satisfied that

10   Dr. DeLoach's February and March 2012 letters did not reflect plaintiff's condition

11   moving forward from the alleged disability onset date of September 15, 2011, but rather

12   her past mental health status, which had actually allowed her to engage in substantial

13   gainful activity.  ALJ Kennedy accorded appropriate weight to Dr. DeLoach's opinion.

14        **3.    <u>Dana Harmon, Ph.D.</u>**

15        In March 2012, Dr. Harmon completed a Review of Medical Evidence form for

16   DSHS.  AR 567-70.  Dr. Harmon indicated a disability onset date of October 27, 2005,

17   based on when plaintiff first sought psychotherapy from Dr. DeLoach, and opined that

18   Dr. DeLoach's estimate of "a likely duration of twelve months" seemed "realistic."

19   AR 567.  Dr. Harmon questioned the reliability of Dr. DeLoach's GAF score of 21, but

20   wrote that plaintiff's "disability still seems clear."  <u>*Id.*</u>  Dr. Harmon checked the "marked

21   or severe limitation" boxes for the following items on the mental functional assessment

22   portion of the form:  perform activities within a schedule and maintain regular punctual

23

attendance; adapt to changes in a routine work setting; communicate and perform effectively in a work setting with public contact; communicate and perform effectively in a work setting with limited public contact; maintain appropriate behavior in a work setting; and complete a normal workday and workweek without interruptions from psychologically based symptoms.  AR 569.

ALJ Kennedy assigned "little to no weight" to the DSHS form because it is merely "a worksheet to aid in deciding the presence and degree of functional limitations" and "does not constitute . . . an assessment of the claimant's residual functional capacity." AR 22.  ALJ Kennedy did not err in ignoring Dr. Harmon's check-box form.  *See* *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (affirming an ALJ's rejection of "check-off reports that did not contain any explanation of the bases of their conclusions").  In addition, any error he might have made was harmless; the only medical evidence that Dr. Harmon reviewed before completing the DSHS form at issue was Dr. DeLoach's discounted February 2012 letter, *see* AR 567-68, and Dr. Harmon's view that plaintiff had "marked or severe" limitations as of October 2005 was inconsistent with her history of substantial gainful activity until September 2011.  AR 45 & 203.

### 4.    Raymond West, M.D.

On May 24, 2012, Dr. West interviewed and physically examined plaintiff.  *See* Ex. 13F.  Plaintiff reported to him that she had been involved in two motor vehicle accidents in 2006, but did not need to go to an emergency department on either occasion. AR 551.  She also told Dr. West that she had received a diagnosis of fibromyalgia in 2008, and that, in connection with such disease, she has burning, throbbing, jabbing,

1  and/or aching pain migrating through her back, legs, and shoulders, ranging between

2  1 and 8 in severity on a scale of 0-to-10.  AR 552.  Plaintiff indicated that she could sit

3  for 30 minutes or possibly a little longer, stand for one hour, and walk a mile and perhaps

4  more, does her own shopping and light housekeeping, exercises and does some volunteer

5  work, and can lift and carry 15 pounds for at least a few steps.  *Id.* at 552-53.  Based on

6  the results of his examination, Dr. West opined that plaintiff is able to stand and to walk

7  for up to six hours cumulatively in an eight-hour day, provided that she can take frequent

8  and possibly prolonged breaks, that she is able to sit in a comfortable chair for up to six

9  hours cumulatively in an eight-hour day, that she can occasionally lift and carry 20-to-25

10 pounds from room to room, and that she can occasionally bend, squat, and kneel, but that

11 crawling and climbing were "best deferred to urgent conditions."  AR 556.

12      ALJ Kennedy ascribed "some weight" to Dr. West's opinion; the only portion he

13 disregarded was Dr. West's suggestion that plaintiff would need "frequent and possibly

14 prolonged breaks" from standing and walking.  *See* AR 22-23.  ALJ Kennedy reasoned

15 that the frequent/prolonged break limitation conflicted with (i) Dr. West's own findings

16 that plaintiff has normal motor strength and sensation in her extremities and full range of

17 motion in her joints, and (ii) plaintiff's statements that she can walk a mile or more,

18 exercise, and do volunteer work.  AR 23.  Plaintiff contends that the frequent/prolonged

19 break limitation is consistent with Dr. West's diagnosis of fibromyalgia, and that her

20 ability to walk a mile in 20-to-30 minutes does not equate with a capacity to stand or

21 walk for 6 hours in an 8-hour shift, with only normal breaks every two hours.  At best,

22 plaintiff's arguments might show that "the evidence is susceptible to more than one

23

ORDER - 17

1    rational interpretation," _Thomas_, 278 F.3d at 954, but even if so, the Court would not

2    substitute its judgment for that of ALJ Kennedy, _see_ _Reddick_, 157 F.3d at 720-21.

3          Moreover, plaintiff's reliance on _Benecke v. Barnhart_, 379 F.3d 587 (9th Cir.

4    2004), is misplaced.  In _Benecke_, two treating rheumatologists agreed that the claimant,

5    who suffered from fibromyalgia, could not sustain full-time employment; one of them

6    opined that the claimant should not sit, stand, or walk for more than one hour at a time,

7    and both of them reported that the claimant's pain and fatigue were severe enough to

8    interfere with her attention and concentration.  _Id._ at 591.  Two examining physicians

9    (an internist and a psychiatrist) and two non-examining practitioners (an internist and a

10   psychologist) indicated that the claimant's physical symptoms had a psychological origin;

11   the mental health specialists diagnosed the claimant with somatization disorder.  _Id._ at

12   592.  The Ninth Circuit concluded that "the ALJ erred in discounting the opinions of

13   Benecke's treating physicians, relying on his disbelief of Benecke's symptom testimony

14   as well as his misunderstanding of fibromyalgia.  The ALJ erred by 'effectively

15   requir[ing] 'objective' evidence for a disease that eludes such measurement.'"  _Id._ at 594.

16         Unlike _Benecke_, this case does not involve essentially opposite diagnoses (_i.e._,

17   fibromyalgia or somatization disorder) or the discounting of treating physicians' opinions

18   in favor of examining and non-examining practitioners' views.  Indeed, in this matter, the

19   administrative record contains no opinion from a physical (as opposed to mental) health

20   treatment provider concerning the effect, if any, of plaintiff's fibromyalgia on her ability

21   to work.  _See_ AR 477 (plaintiff's fibromyalgia was in "fair control"); AR 613-14 (annual

22   examination revealed no apparent distress, normal musculature, normal extremities, no

23

skeletal tenderness or joint deformity, no tenderness in the back, and no signs of unusual

anxiety or depression).  Thus, ALJ Kennedy was not faced here with a diagnostic dispute

among practitioners, but rather with a limitation articulated by an examining physician

that was inconsistent with the physician's own findings and plaintiff's representations

about her abilities.  _Benecke_ does not support a conclusion that ALJ Kennedy erred.

### 5.   **June Tanner**

On May 2, 2012, June Tanner completed an intake assessment for Sound Mental

Health.  AR 587-600.  According to Tanner, plaintiff described her problem as "DSHS

said I needed mental health, I'm not able to work.  I have major depression, PTSD, and

fibromyalgia."  AR 587.  Tanner spent approximately 90 minutes asking about plaintiff's

symptoms, social functioning, family history, medical conditions, current medications,

and use of drugs or alcohol, and assessing plaintiff's mental status.  On the intake form,

Tanner checked boxes indicating that plaintiff was well-groomed, pleasant, and

cooperative, had a full range of expression, good eye contact, and a normal rate and

rhythm of speech, exhibited a logical and connected thought process, as well as

appropriate thought content, was fully oriented, and had fair judgment and insight, but

showed some impairment in her memory and was restless, depressed, and anxious.

AR 593-95.  Tanner noted no impairment in cognitive functioning and no disability,

although she also scored plaintiff as either marked or severely impaired with respect to

social withdrawal, response to stress, sustained attention, health status, depressive

symptoms, and anxiety symptoms.  AR 595-96.  In the diagnosis formulation section of

the intake report, Tanner wrote:

> 36 yr old divorced female, on ABD, may need housing, went to fairfax in 08
> Client has struggled with her depression most of life.  reports severe
> anxiety, panic attacks heart racing, blank mind recurring almost once a
> week.  Tearfulness almost every day, trouble sleeping, some s/i, feeling of
> worthlessness, difficulty concentrating.   HX of neglect as a child, was
> attacked by boyfriend last year.

AR 598.  Tanner assigned plaintiff a GAF score of 44.  *Id.*; *see* DSM-IV-TR at 34

(a GAF rating between 41 and 50 reflects "[s]erious symptoms (e.g., suicidal ideation,

severe obsessive rituals, frequent shoplifting)" or "any serious impairment in social,

occupations, or school functioning (e.g., no friends, unable to keep a job)").

In his decision, ALJ Kennedy did not discuss the intake form completed by

Tanner.  The Court is satisfied that ALJ Kennedy did not err in this regard.  The check-

box document did not constitute an opinion of a treatment provider, but rather recorded

plaintiff's responses to a standard set of questions and the clinician's first impressions

about plaintiff based on her answers.  Tanner offered no views concerning whether

plaintiff could work, and when given the option to choose "up to five" of ten possible

disability statuses, including "Other Medical or Physical Disabilities," Tanner checked

only "No Disability."  AR 596.  Moreover, Tanner's ratings of plaintiff's alleged

impairments and her GAF score were based entirely on a 90-minute interview, and they

were contradicted by the opinions of Bruce Eather, Ph.D. and Michael L. Brown, Ph.D.,[10]

who reviewed the medical and work history evidence in the record and had a better

understanding of plaintiff's longitudinal condition.  *See* Exs. 3A, 4A, 7A, & 8A.  Thus,

---

[10] Drs. Eather and Brown are consultants for the Division of Disability Determination Services, a state agency that, pursuant to federal regulations, makes initial assessments concerning eligibility for DIB and SSI benefits and processes reconsideration requests.

1  any error in ignoring Tanner's intake assessment was harmless because the Court "can

2  confidently conclude that no reasonable ALJ, when fully crediting the testimony, could

3  have reached a different disability determination."  *See* *Stout v. Comm'r, Soc. Sec.*

4  *Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006).

5  **C.   Stability of Plaintiff's Condition**

6          In his decision, ALJ Kennedy cited several Ninth Circuit decisions for the

7  proposition that "working with an impairment supports a conclusion that it is not

8  disabling."  AR 20 n.1.  ALJ Kennedy further observed that plaintiff's fibromyalgia and

9  mental health conditions are stable.  AR 20.  Plaintiff contends that, as a result of her

10 ex-boyfriend's attack in October 2011, which exacerbated all of her symptoms, she was

11 not, in fact, stable after her alleged disability onset date of September 15, 2011.  Plaintiff

12 further argues that ALJ Kennedy improperly required her to provide "objective evidence"

13 that her longstanding impairments, which had not prevented her from working in the past,

14 had "drastically worsened."

15         Plaintiff's first assertion is belied by (i) the assessments of a treating psychiatrist,

16 D.E. Raphaely, M.D., who indicated on February 3, 2012, that she was "psychiatrically

17 better w/ current meds," even though unemployment and money remained significant

18 stressors, AR 490, and on April 6, June 8, July 19, and September 26, 2012, that she was

19 "psychiatrically stable," AR 605-06, and (ii) treatment notes made on October 10, 2011,

20 one week after the alleged assault, describing plaintiff's chronic anxiety and depression

21 as "controlled" and her fibromyalgia as under "fair control," AR 477.  Plaintiff's second

22 point overemphasizes the language in ALJ Kennedy's sole footnote.  While remarking in

23

1   the footnote that a chronic, non-disabling impairment should not prevent work at the

2   present or in the future absent "objective evidence of drastic worsening," AR 20 n.1,

3   ALJ Kennedy did not actually apply such standard in this case.  Nowhere in his decision

4   does ALJ Kennedy consider whether plaintiff's condition has declined, or whether any

5   such deterioration is both "drastic" and apparent from the objective evidence.  Thus, any

6   error in articulating an overly high burden of proof did not affect the result in this case

7   and is harmless.

8   **D.   <u>Plaintiff's Credibility</u>**

9       ALJ Kennedy's decision contains the following passage:

10          After careful consideration of the evidence, I find that the claimant's
            medically determinable impairments could reasonably be expected to cause
11          some of the alleged symptoms.  However, for the following reasons, I do
            not find all of the claimant's statements concerning these symptoms to be
12          credible.

13   AR 19.  Plaintiff argues that ALJ Kennedy failed to explain which of plaintiff's alleged

14   symptoms were considered not credible, making review of ALJ Kennedy's credibility

15   determination impossible.  The Court disagrees.  In the absence of affirmative evidence

16   showing that a claimant is malingering, an ALJ's reasons for rejecting the claimant's

17   testimony must be "clear and convincing."  *Lester*, 81 F.3d at 834.  The Ninth Circuit has

18   warned that general findings concerning a claimant's credibility are insufficient; rather,

19   an ALJ "must identify what testimony is not credible and what evidence undermines the

20   claimant's complaints."  *Id.*

21       ALJ Kennedy satisfied these requirements.  He indicated what testimony he was

22   discounting, namely plaintiff's statements about her symptoms, which ALJ Kennedy

23

summarized as an inability to sit at a desk and/or type for a full eight-hour day because of muscle spasms and chronic pain from fibromyalgia, an inability to commit to anything for an extended period of time because of mental health symptoms, erratic sleeping patterns, difficulty arriving at work or appointments on time, excessive absenteeism resulting from low mood and anxiety, and difficulty staying focused on the job.  AR 19. ALJ Kennedy explained that he doubted plaintiff's credibility because she had been able to work despite these symptoms, which had remained stable since she was last employed. The Court is satisfied that this reason is sufficiently "clear and convincing" and supported by the record.

**E.**    **Plaintiff's Parents' Statements**

Plaintiff resides in Washington.  Her mother and father live in Utah.  Both parents submitted letters in support of plaintiff's DIB and SSI applications.  *See* AR 314-16.  In their letters, they indicated that, in October 2012, plaintiff had an extended stay with them, and they described her as then being able to assist in caring for her ailing 98-year-old grandmother, but only for a few hours each day.  *Id.*  Plaintiff's mother further stated that she had observed plaintiff having difficulty carving pumpkins for Halloween because she was experiencing cramping in her hands, and that plaintiff had spent some days of the October 2012 visit in bed as a result of a sore throat, a cold, pain, or just not feeling well. AR 315.  In a separate form completed months earlier, plaintiff's mother wrote that plaintiff's "depression makes it a challenge to even get out of bed some days" and that plaintiff "is in pain most of the time making it difficult to function normally."  AR 241. In her subsequent letter, plaintiff's mother opined that plaintiff cannot, at this time, work

ORDER - 23

1    full time, but might be able to "hold down a part-time job" if she "could get some training

2    and education in a different field."  AR 315.  Plaintiff's father characterized plaintiff as

3    "still brilliant at times, then down and out for days[,] making it easy to get a job, but

4    impossible to keep one."  AR 316.

5           In his decision, ALJ Kennedy did not mention plaintiff's parents' observations

6    during the October 2012 visit, but he did discuss their opinions about the effects of

7    depression and pain on plaintiff's ability to get out of bed and maintain a full-time

8    position.  *See* AR 23.  ALJ Kennedy gave "little weight" to such opinions because they

9    appeared to be based on plaintiff's subjective reports.  *Id.*  ALJ Kennedy's reasoning is

10   sound; plaintiff's parents reside in a different state and, for the most part, their views

11   have been formed by what plaintiff has told them on the phone.  *See* AR 315-16.  To the

12   extent that ALJ Kennedy improperly failed to consider the parents' statements about

13   plaintiff's condition in October 2012, the Court is persuaded that any error is harmless.

14   In lamenting about plaintiff's inability to care for her grandmother for more than a few

15   hours each day, plaintiff's parents provide no information concerning the nature of such

16   activity, which might have exceeded the residual functional capacity outlined for plaintiff

17   by ALJ Kennedy.  Indeed, plaintiff's father acknowledged that he would himself have

18   difficulty "doing 2 shifts in a day."  AR 316.  Moreover, pumpkin carving is not a work

19   task associated with the jobs that the vocational expert opined plaintiff could handle, and

20   temporarily suffering from a sore throat or a cold does not rise to the level of a disability.

21   The Court is satisfied that no reasonable ALJ, having considered plaintiff's parents'

22

23

1   observations in October 2012, could have reached a different disability determination.

2   *See* *Stout*, 454 F.3d at 1056.

3   **F.     DSHS Benefits**

4          Plaintiff contends that ALJ Kennedy erred in not explaining why he ignored

5   plaintiff's receipt of DSHS benefits, citing to Social Security Ruling 06-03p,[11] which

6   reads in relevant part:

> [F]inal responsibility for deciding certain issues, such as whether you are
> disabled, is reserved to the Commissioner.  However, we are required to
> evaluate all the evidence in the case record that may have a bearing on our
> determination or decision of disability, including decisions by other
> governmental and nongovernmental agencies.  Therefore, evidence of a
> disability decision by another governmental or nongovernmental agency
> cannot be ignored and must be considered. . . .  Because the ultimate
> responsibility for determining whether an individual is disabled under
> Social Security law rests with the Commissioner, we are not bound by
> disability decisions by other governmental and nongovernmental agencies.
> In addition, because other agencies may apply different rules and standards
> than we do for determining whether an individual is disabled, this may limit
> the relevance of a determination of disability made by another agency.
> However, the adjudicator should explain the consideration given to these
> decisions in the notice of decision for hearing cases and in the case record
> for initial and reconsideration cases.

SSR 06-03p (citations omitted).  The administrative record, however, contains no reliable

evidence of either an award of benefits or a determination of disability by DSHS.  Rather,

the materials plaintiff has cited consist of (i) an application for education or training

---

[11] "Social Security Rulings constitute the Social Security Administration's interpretations of the statute it administers and of its own regulations."  *Chavez v. Astrue*, 699 F. Supp. 2d 1125, 1135 n.8 (C.D. Cal. 2009) (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005)).  Although they do not have "the force of law," after Social Security Rulings are published, they are binding on ALJs and the Commissioner.  *Id.* (citing *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999); *Chavez v. Dep't of Health & Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996)).

assistance from DSHS's Division of Vocational Rehabilitation ("DVR"), AR 305, which

reflects that, according to plaintiff, she was receiving "General Assistance" in the amount

of $197, and (ii) the Review of Medical Evidence form completed by Dr. Harmon,

AR 570, which offers no information about whether plaintiff was receiving DSHS

benefits.  Although plaintiff has not, in her briefing, mentioned June Tanner's recitation

of plaintiff's assertion that she was receiving aged, blind, or disabled ("ABD") cash

assistance, _see_ AR 598, the Court has considered such evidence, but has concluded that it

suffers from the same deficiency as the DVR application to which plaintiff has referred;

both documents reflect only plaintiff's self-reports and do not constitute credible

evidence that plaintiff has been declared "disabled" by DSHS.[12]  ALJ Kennedy's silence

regarding plaintiff's alleged receipt of DSHS benefits did not amount to error.

---

[12] Even if plaintiff was getting General Assistance - Unemployable ("GAU") benefits, as indicated in her DVR application, such fact would not demonstrate a DSHS determination of "disability."  Under the GAU program, which was in effect until 2010, an individual could receive benefits if he or she was merely "incapacitated," meaning he or she could not be gainfully employed as a result of a physical or mental impairment that was expected to continue for only 90 or more days (as opposed to the twelve or more months required under the Social Security Act to establish "disability").  _See_ WAC 388-448-0001 (2009).  GAU benefits could continue if the recipient demonstrated "no material improvement" in his or her "medical or mental condition."  _See_ RCW 74.04.005(6)(g) (2009).  In contrast, to qualify under the current system for ABD cash assistance, a person must be (i) 65 years of age or older, (ii) blind, or (iii) "likely to be disabled."  WAC 388-400-0060(1)(a).  For purposes of the ABD program, the term "disabled" or "disability" has essentially the same meaning as under the Social Security Act, namely "the inability to engage in any substantial gainful activity" because of a "medically determinable physical or mental impairment" that can be expected to result in death or to last for a continuous period of at least twelve months.  WAC 388-449-0001(1)(c); _compare_ 42 U.S.C. §§ 416(i)(1) & 1382c(a)(3).  Although ABD eligibility might have required discussion on ALJ Kennedy's part, Tanner's passing reference to plaintiff being "on ABD," AR 598, is simply insufficient to support plaintiff's assignment of error.

ORDER - 26

1   **<u>Conclusion</u>**

2       For the foregoing reasons, the denial of plaintiff's DIB and SSI applications is

3   AFFIRMED.  The Clerk is DIRECTED to enter judgment accordingly and to send a copy

4   of this Order to all counsel of record.

5       IT IS SO ORDERED.

6       Dated this 14th day of October, 2016.

7

8                                     _Thomas S. Zilly_

9                                       Thomas S. Zilly
                                      United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER - 27